**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230457-U

Order filed October 29, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| *In re* ESTATE OF ELLEN JUNE O'CONNOR, Deceased | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| (Thomas J. O'Connor and Kimberly Slick, Petitioners-Appellants, | ) ) ) | Appeal No. 3-23-0457 |
| v. | ) ) ) | Circuit No. 17-P-255 Honorable |
| Dennis J. O'Connor and Terrance F. O'Connor, Respondents-Appellees.) | ) ) | Kenneth L. Zelazo, Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Justices Brennan and Albrecht concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  Summary judgment was improper where a genuine issue of material fact exists as to whether respondents were fiduciaries of their decedent mother at the time she executed certain trust and will instruments. Reversed and remanded.

¶ 2    Petitioners, Thomas J. O'Connor (Thomas) and Kimberly Slick (Kimberly), filed an 11-count amended petition to contest various wills and trusts executed by the decedent, Ellen June O'Connor (Ellen), and for a citation to recover assets of Ellen's estate. The circuit court granted summary judgment to respondents, Dennis J. O'Connor (Dennis) and Terrance F. O'Connor

(Terrance), on two counts of the amended petition that sought to nullify a 2000 trust and 2001 will executed by Ellen.[1]

¶ 3 Petitioners appeal, under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), from the circuit court's judgment. They argue genuine issues of material fact precluded the circuit court's finding, as a matter of law, that Dennis and Terrance were not fiduciaries of Ellen when she executed those documents. We agree and, therefore, reverse and remand for further proceedings.

¶ 4 I. BACKGROUND

¶ 5 Ellen died on December 18, 2012, at the age of 95. Beginning in 2000, Ellen executed a series of wills and trusts: an April 25, 2000, trust; a March 8, 2001, will; a September 19, 2005, trust; an October 16, 2009, amendment to the 2005 trust; and an October 16, 2009, will. This appeal concerns the validity of the 2000 trust and the 2001 will.

¶ 6 A. The O'Connor Family

¶ 7 Ellen was married once, to Gerald Frank O'Connor (Frank), who died in 2002. Ellen and Frank had five children: Maureen, Dennis, Debra, Thomas, and Terrance. Maureen had three children with her husband. Debra married Stevan Brockman (Steve) and adopted a daughter, Kimberly Slick. Thomas had one son with his wife. Neither Dennis nor Terrance ever married, and they have no children. Debra and Maureen died before Ellen.

¶ 8 Ellen had one sibling, Lavern Morgan (Lavern), who was a bachelor and had no children. He also died before Ellen.

¶ 9 B. Ellen and Lavern Inherit Their Parents' Property

---

[1]Where appropriate, we will refer to Thomas and Kimberly collectively as petitioners and Dennis and Terrance collectively as respondents.

¶ 10        In 1974, Ellen and Lavern inherited land in Will County from their parents. Lavern inherited approximately 200 acres of farmland, including his home, adjacent to Cherry Hill Road. Ellen inherited approximately 120 acres adjacent to Route 53 including her home and approximately 100 to 110 acres of farmland. Additionally, Lavern and Ellen each inherited a 50% interest in an undivided 160-acre parcel adjacent to Hoff Road (Hoff Road property). Frank had no ownership interest in Ellen's land or her home.

¶ 11        Ellen and Frank lived with their children. Over time, the children all moved out. However, in 1984, Dennis moved back, and in the early 1990s, Terrance moved back. Dennis and Terrance have lived there ever since.

¶ 12        In the 1980s, Dennis and Ellen became joint tenants on a BankFinancial checking account, which was closed when Ellen died. Ellen also had an account at Joliet Federal Savings and Loan Association (Joliet Federal). Dennis did not provide details concerning the Joliet Federal account other than Ellen had it for a long time and closed it well before her death. In addition, Dennis opened the "[Ellen] O'Connor Trust Account" at Chase Bank at some point after January 2007 but Ellen had no ownership interest in that account.

¶ 13        Frank farmed Ellen's land. Thomas began assisting Frank with the operation while in high school and continued to do so while working full time elsewhere. When Frank "officially" retired in 1992, Thomas took over the operation. He paid rent to Ellen to farm the land.

¶ 14                                C. The Tyler Foreclosure Scare

¶ 15        In the 1970s, the Tyler grain elevator (Tyler) extended credit to Frank and Ellen. By 1981, Frank owed Tyler approximately $108,000. He executed an unsecured note in 1981, which charged 24% interest, in Tyler's favor for that amount. Through a series of documents in 1981 and 1982, Ellen became jointly responsible for Frank's debt, and Tyler obtained a security interest in 45 acres

3

of Ellen's farmland. At the time, Ellen and Frank's children were not aware of Frank's significant debt or that some of Ellen's land had been encumbered. After viewing the documents, Dennis believed the transaction was fraudulent and suspected Thomas had forged Ellen's signature on one of the documents.

¶ 16    In March 1992, Steve learned Ellen's land had been encumbered and Tyler was threatening foreclosure if Ellen and Frank did not pay their debt by December 1, 1992. At the time, the balance due was approximately $115,000. Steve told Debra a few days later.

¶ 17    In April 1992, Debra and Steve called Debra's siblings to a meeting. Debra told them about Ellen and Frank's predicament. The next day, Dennis, Terrance, Debra, Thomas, and Steve met with Debra and Steve's accountant, Jim Halstead, to discuss possible solutions. During the meeting, it was determined Steve and Debra could offer Ellen $115,000 or $145,000 to buy the 45 acres encumbered by Tyler's interest. (There is testimony supporting both monetary amounts.) Dennis, a licensed real estate broker, believed this offer significantly undervalued the property. He believed the 45 acres were worth at least $6000 per acre to a developer, because it was adjacent to the Village of Elwood. Dennis recalled that Debra interjected, asking Halstead if Debra and Steve could buy all of Ellen's land for $300,000. Dennis and Terrance speculated that Debra and Steve did not have that much cash and Lavern was backing them. According to Dennis, Lavern had always wanted Ellen's land. Lavern believed he should have inherited it.

¶ 18    After the meeting, Dennis, Terrance, Debra, Thomas, and Steve went to Ellen and Frank's home to confront them about Ellen and Frank's predicament and to convey an offer. Dennis and Terrance arrived 15 minutes before the rest and told Ellen that Debra and Steve were coming to make her an offer. Ellen told Dennis that her farm was "not for sale." When Debra and Steve arrived, they made an offer to Ellen. A dispute exists as to what Debra and Steve offered Ellen.

4

Dennis testified that Debra and Steve offered Ellen $300,000 for all of Ellen's land, while Steve recalled they offered $145,000 for the 45 acres encumbered by Tyler's security interest. In any event, Ellen rejected Debra and Steve's offer.

¶ 19　　Later in 1992, Dennis saw his longtime friend, Gerald Girard, at a bar. He had known Girard since 1962. Girard told Dennis that his mother had died and he had received a substantial inheritance. They did not discuss Ellen's predicament at the time.

¶ 20　　Days later, Ellen and Dennis went to Girard's house. Dennis explained Ellen's predicament and asked to borrow $115,000 from Girard. Girard agreed to loan Ellen the money at 6.5% interest in exchange for a security interest in Ellen's undivided 50% interest in the Hoff Road property. Girard transferred the money to Dennis, and Dennis tendered a cashier's check to Tyler for the balance of Ellen and Frank's debt. Tyler sent a letter to Dennis, thanking him personally for resolving the matter.

¶ 21　　According to Steve, Dennis and Terrance later convinced Lavern to partition the Hoff Road property. Dennis marketed Ellen's partitioned piece of the Hoff Road property, and it was sold in 2000 for $6600 per acre. The proceeds of the sale were used to pay off Ellen's $115,000 loan with Girard.

¶ 22　　　　　　　　　　　　　　D. DTO Group

¶ 23　　In 1991, Dennis and Terrance formed DTO Group, Inc., which later became DTO, LLC (collectively, DTO). A dispute exists as to whether Ellen had an interest in the company. Dennis testified Ellen had an interest, and Terrance testified she did not. According to Dennis, they formed the company because they planned "to develop *** property in Elwood" and wanted to have a company through which to run sales. In 1993, Ellen sold 10 of the 45 acres previously encumbered by Tyler. A short time later, DTO and Girard purchased a 20-acre parcel adjacent to Ellen's land.

5

To make the purchase, Ellen, Dennis, and Terrance borrowed $58,000 from Girard. Girard received cash rent on the property, which Thomas farmed, until 2007, when the parcel was sold.

¶ 24                                    E. The Tyler Litigation

¶ 25        In 1992, Dennis met with attorney Tom Carey to discuss his concerns over Ellen and Frank's dealings with Tyler. Dennis brought Ellen and Terrance to the meeting, and they reviewed documents with Carey. Though Ellen was Carey's client, Dennis acknowledged he took an "active role" in assisting Carey. Carey requested documents from Dennis. Dennis was present for every meeting with Carey and spoke with Carey multiple times. Ultimately, Carey did not sue Tyler. However, he wrote a letter to Tyler regarding Ellen and Frank's 1991 interest payment.

¶ 26        In October 1995, Dennis decided to send a letter to the Attorney Registration and Disciplinary Commission (ARDC), alleging Tyler's attorney, Joseph Tryner, committed various acts of misconduct. Dennis typed the letter in the first person for Ellen's and Frank's signatures. Dennis had been recording phone calls between Tyler and Ellen, and he enclosed with the letter a recording and self-made transcript of a call between Tyler and Ellen.

¶ 27        In 1996, Dennis and Ellen met with another attorney, Vincent Portlock, to get a "second opinion" on a possible lawsuit against Tyler. Portlock declined to sue but wrote a letter to Tyler. Portlock invited Dennis's comments on a draft of the letter. At the conclusion of his involvement, Portlock wrote a letter to Dennis, stating his firm would "not be representing you in any action you may decide to bring concerning this matter" and suggesting Dennis consult with other counsel.

¶ 28        Also in 1996, Dennis took the document he believed Thomas had forged to the Will County State's Attorney's Office (WCSAO). He asked the WCSAO to investigate and followed up two or three times via telephone. Ultimately, the WCSAO did not pursue charges.

6

¶ 29        In 1998, Dennis looked for another attorney, one who was a certified public accountant who would "understand the accounting better than [Tyler] did." He looked in the phonebook and found attorney John Ridge. In November 1998, Ridge sued Tyler on Ellen's behalf. The lawsuit was dismissed in August 2000.

¶ 30        In August 2002, Ridge filed, on Ellen's behalf, a petition to vacate the judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2002)). Tyler moved to dismiss the petition. Dennis signed an affidavit that was attached to the response to that motion. Dennis stated he had been "involved in this litigation from its beginning" and swore to the truth of the response's factual allegations. The section 2-1401 petition was dismissed, and Ellen and Ridge were sanctioned. See Ill. S. Ct. R. 137 (eff. Feb. 1, 1994).

¶ 31                                    F. Ellen's 2000 Trust and 2001 Will

¶ 32        In the meantime, Ellen met with Ridge to discuss her estate plan. Dennis drove her to Ridge's office but was not present when Ellen and Ridge discussed her estate plan. Ridge believed Ellen was in good physical and mental health at the time, and he had no concerns about her testamentary capacity.

¶ 33        After their meeting, Ridge prepared the 2000 trust and 2001 will. The 2000 trust was irrevocable. It named Frank as the primary beneficiary and Girard as the trustee. Ridge told Ellen not to select a family member as trustee, so she named Girard because he was a family friend whom Ellen could trust. Ellen deeded approximately 35 acres into the trust. (This parcel was the 45 acres previously encumbered by Tyler, minus the 10 acres Ellen sold in 1991.) The 35 acres did not include Ellen's residence. The trust provided Frank with the trust's net income during his life, and the trustee had discretion to distribute the principal for Frank's education, health,

maintenance and support. Upon Frank's death, Dennis and Terrance would each receive one half of the remaining trust property.

¶ 34    Ellen did not sign the trust at Ridge's office. Rather, Ridge mailed it to Ellen, and she signed it at a bank with Dennis and Girard. At the same time, Ellen deeded the 35-acre parcel into the trust. Dennis signed the metes and bounds affidavit on the deed and the tax-exemption certificate. Dennis also directed the deed and future property tax bills to be mailed to him.

¶ 35    At his deposition, Girard testified he did not read the trust when he signed it. He never received a copy during Ellen's lifetime. Girard took no role in the trust's administration. He did not take in receipts or make the required payments to Frank. That was handled by Ellen. According to Girard, Ellen wanted Girard to be a "trustee in name" but "[n]ot in fact."

¶ 36    In her 2001 will, Ellen made specific bequests to Frank, who would receive a life estate in her residence, and Maureen, Debra, and Thomas, who would receive $10,000 each. Ellen gave the remainder of her estate to Dennis and Terrance, to be divided equally between them. The 2001 will named Dennis as executor and Terrance as successor.

¶ 37    When Frank died in 2002, Dennis and Terrance became the owners of the 35-acre parcel.

¶ 38                                G. Ellen's 2005 Trust

¶ 39    Dennis met attorney Daniel J. McCarthy III at a property Dennis had listed in Manhattan. McCarthy was also a licensed real estate broker. Dennis told McCarthy he was looking for an estate-planning attorney for Ellen. In 2005, McCarthy had a telephone conference with Dennis and Ellen. Ellen told McCarthy she wanted to get her affairs in order and was also concerned about avoiding federal estate tax upon her death.

¶ 40    McCarthy prepared for Ellen the 2005 trust, a deed into trust, and a property power of attorney naming Dennis as her agent. The 2005 trust named Ellen and Dennis as cotrustees. It

8

provided Ellen with net income and principal distributions during her lifetime. Upon Ellen's death, Dennis and Terrance would receive equal, one-half shares, to the exclusion of Ellen's other children and grandchildren. Ellen deeded into the trust the approximately 65-acre parcel on which her residence sat. Dennis again signed the metes and bounds affidavit attached to the deed and directed that the deed and future property tax bills be mailed to him.

¶ 41                    G. Ellen Sells Her Remaining Land to Dennis and Terrance

¶ 42       In April 2006, Dennis and Terrance purchased Ellen's remaining 65-acre parcel for $1,809,640. An appraisal confirmed this was the approximate fair market value of the 65-acre parcel. At the time, Dennis, Thomas, and McCarthy were all aware that CenterPoint Intermodal, LLC (CenterPoint), was interested in purchasing Ellen's land. However, there is no indication the appraiser was aware of CenterPoint's interest.

¶ 43       McCarthy represented Ellen in the transaction, which was designed to take advantage of Ellen's federal gift-tax exemption. On April 14, 2006, McCarthy wrote to Ellen to confirm she had engaged him as counsel for this transaction. According to the letter, the sale was structured as follows. Ellen gifted Dennis and Terrance a total of $1,024,000, in the form of a credit off the sale price. Dennis and Terrance were obligated to pay $785,640 plus 4.79% interest in 10 equal, annual installments of $99,216.87, beginning in April 2007. Dennis testified that he and Terrance paid 5 or 6 of the 10 installments until Ellen died. However, respondents produced no documents to substantiate Dennis's testimony.

¶ 44                    H. CenterPoint Intermodal Purchases the Land

¶ 45       In July 2006, Dennis and Terrance entered into a purchase and sale agreement with CenterPoint. CenterPoint agreed to purchase the 35-acre parcel owned by Dennis and Terrance via the 2000 trust and 55 of the 65 acres Dennis and Terrance purchased from Ellen in April 2006.

9

Dennis and Terrance kept the residence and approximately 10 acres on which it sat. CenterPoint also agreed to purchase the 20-acre parcel owned by DTO. The sale closed in January 2007. In total, Dennis and Terrance received almost $8 million from the sale. McCarthy represented Dennis and Terrance in the transaction.

¶ 46                  I. The 2009 Amendment to Ellen's Trust and Her New Will

¶ 47       In October 2009, Ellen amended the 2005 trust and executed a new will. Under these documents, Ellen made the following specific bequests: $20,000 to Debra, $20,000 to Thomas, and $5000 to each of her grandchildren. The remaining property would be distributed to Dennis and Terrance in equal shares upon Ellen's death.

¶ 48                         J. Ellen's Guardianship

¶ 49       In 2009, Thomas and Debra suspected Dennis and Terrance were exploiting Ellen and filed a petition for guardianship. During their depositions, petitioners recalled "lavish" spending on new cars (though Ellen did not drive) and on home renovations and new construction, none of which were designed to help Ellen, who at the time was in a wheelchair. Around the same time, Thomas and Debra asked the WCSAO to investigate Dennis and Terrance, and a search warrant was executed at the home. Terrance was ultimately appointed as Ellen's guardian. Ellen was moved into a nursing home, where she remained until her death. Dennis and Terrance paid for her stay at the nursing home, using the proceeds of the CenterPoint sale.

¶ 50                            K. The Petition

¶ 51       In October 2017, Ellen's 2009 will was admitted to probate. In April 2018, petitioners filed a petition to set aside Ellen's 2005 trust, its 2009 amendment, and Ellen's 2009 will. They also sought a citation to recover assets against Dennis and Terrance, seeking a return of the proceeds from the sale of Ellen's land to CenterPoint.

¶ 52    Petitioners later amended the petition, adding two counts that are at issue in this appeal: counts 10 and 11. In those counts, petitioners alleged Dennis was a fiduciary of Ellen as a matter of fact, because she relied on him for her day-to-day needs and activities. Petitioners alleged Dennis breached his fiduciary duty to Ellen by his involvement in the scheduling and execution of the 2000 trust and 2001 will, which expressly benefited Dennis and Terrance to the detriment of Ellen and her other children. In addition, petitioners asserted Dennis's breach could be imputed to Terrance, effectively vitiating both documents. Petitioners sought an order nullifying Ellen's 2000 trust and 2001 will based on Dennis's breach of his fiduciary duty.

¶ 53                          L. Respondent's Motion For Summary Judgment

¶ 54    Respondents moved for summary judgment on counts 10 and 11 of the amended petition. They asserted petitioners had not come forward with evidence to establish either Dennis or Terrance were Ellen's fiduciary as a matter of fact at the time Ellen executed the 2000 trust and 2001 will.

¶ 55    In response, petitioners asserted Dennis dominated Ellen's daily life after March 1992, as evidenced by Dennis's intimate, substantial involvement in Ellen's legal affairs. They also argued the transactions postdating the 2000 trust and 2001 will, through which Dennis and Terrance came to own and sell nearly all of Ellen's land during her life, "constituted one continuous process of manipulation, domination and acquisition, *** originating in the mind of Dennis ***, who was the driving force."

¶ 56    The parties attached several exhibits, including depositions, to their written filings. Those exhibits established the following (in addition to what is set forth above). From 1995 until she signed the 2000 trust and 2001 will, Ellen was in good mental and physical condition. According to Kimberly, Ellen remained "sharp" until she moved into the nursing home. There is no evidence,

11

however, that Ellen required assistance to perform her activities of daily living, such as dressing, cooking, eating, bathing, or toileting, at the time she executed the 2000 trust and 2001 will. Ellen let her driver's license lapse before 2001. She did not rely solely on Dennis or Terrance to drive her places; Debra and Maureen also drove her. Additionally, there is no evidence that Ellen required assistance with her personal finances, such as writing checks, making deposits, or paying bills, or that Dennis and Terrance were involved with Ellen's medical needs.

¶ 57    Before 2001, Thomas, Debra, and Kimberly visited with Ellen regularly. Kimberly testified that when she and Debra called Ellen, Ellen usually answered on speakerphone, which made the phone calls awkward. She believed this was a way for Dennis and Terrance to surveil Ellen's conversations. Kimberly also testified that she and Debra never got "alone time" with Ellen. Their in-person visits were "heavily chaperoned" and were "usually hijacked by Dennis," who would talk about the Tyler litigation during each one of their visits. According to Kimberly, what were friendly, lighthearted visits turned into "aggressive rant[s] about whatever was happening [with the Tyler litigation] at that time."

¶ 58    Kimberly also recalled instances in which Dennis and Terrance exhibited "bossy" or controlling behavior toward Ellen. At family parties, Dennis would yell at Ellen to sit down, direct her to "just stay there," and tell her "it was time to go." Dennis also exercised control over the household, for example, controlling where they went, what they ate, and who could visit and when. Sometimes when Debra would call to arrange a visit with Ellen, Dennis would tell her "it wasn't a good time" or that they were going somewhere.

¶ 59    Thomas also frequently visited Ellen before 2001, both in-person and by telephone. According to Thomas, Dennis began "isolating" Ellen in the late 1990s. Dennis was always present for his visits beginning around 1999 or 2000. Dennis did not allow Thomas to speak to Ellen by

12

herself around that same time. Dennis also stopped Ellen from answering Thomas's questions about "anything more than just about the weather." Thomas testified that Frank was "under the same rules" as Ellen. When Thomas called Ellen, he only spoke for a few minutes because Thomas suspected he was being recorded. Dennis confirmed in his testimony that at least incoming call from Debra was recorded in 1992.

¶ 60　　At his deposition, Thomas testified to Dennis's involvement with Ellen's business affairs. Even though Thomas was farming Ellen's land in 2000, Dennis did not allow him to speak with Ellen or Frank about farming the land. Dennis was present with Ellen when Thomas signed the leases to farm Ellen's land.

¶ 61　　At his deposition, Dennis testified that he last actively sold real estate in 1994. He explained, "After everything that happened at home, everything that my mother went through, I just—I gave up. Basically, I devoted my life to her, taking care of her." According to Dennis, he "could not work and take care of [Ellen] at the same time." Though he was no longer selling real estate at the time, Dennis "worked for" Ellen, maintaining her rental house at the Hoff Road property and the grounds at her residence. Ellen did not compensate Dennis for this work, other than allowing him to live in the home without contributing to the household expenses.

¶ 62　　　　　　　　　　　M. The Circuit Court's Ruling

¶ 63　　After a hearing, the circuit court granted respondents' motion, finding there existed no genuine issue as to whether respondents were Ellen's fiduciaries at the time she executed the 2000 trust and 2001 will. The court later made an express written finding under Rule 304(a), and this appeal followed.

¶ 64　　　　　　　　　　　　　II. ANALYSIS

13

¶ 65    Petitioners contend the circuit court erred when it granted summary judgment to respondents on counts 10 and 11 of the amended petition.

¶ 66                              A. Standard of Review

¶ 67    Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). Summary judgment is a drastic means of disposing of litigation and should not be granted unless the moving party's is clearly entitled to judgment. *Heath v. City of Naperville*, 2024 IL App (3d) 230663, ¶ 49.

¶ 68    The purpose of summary judgment is to determine whether there exists a genuine question of material fact that the factfinder must resolve. *Id.* ¶ 50. A triable issue exists when the material facts are disputed or when reasonable persons might draw different inferences from the undisputed facts. *Id.* When deciding a summary judgment motion, the circuit court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant. *Id.* The nonmoving party, however, may not rely on speculation or conjecture to avoid summary judgment. *Id.* Rather, the nonmoving party must present some evidence that would arguably warrant relief. *Id.* We review *de novo* the grant of summary judgment. *Id.*

¶ 69                              B. Fiduciary Relationships

¶ 70    A fiduciary relationship exists when a person places special confidence in another, "who in equity and good conscience, is bound to act in good faith and with due regard to the interest of the person" who has placed the confidence. *Hensler v. Busey Bank*, 231 Ill. App. 3d 920, 927 (1992). A fiduciary relationship may exist as a matter of law. *Id.* at 928. Or, as alleged in this case, a fiduciary relationship may exist based on the particular facts, "such as a relationship where trust

14

is reposed on one side and there is resulting superiority and influence on the other side." *Id.* When a person alleges that a fiduciary-in-fact relationship exists, the party seeking relief must plead and prove by clear and convincing evidence facts establishing the fiduciary relationship. *Id.* To determine whether a fiduciary in fact relationship exists, the factfinder should consider the following factors: (1) the degree of kinship, (2) the disparity of age, health, and mental condition, and (3) the extent to which the allegedly servient party entrusted the handling of his business and financial affairs to and placed faith and confidence in the dominant party. *Id.* at 927. In addition, the factfinder must determine whether the allegedly dominant party actually accepted the trust and confidence placed in him by the other. *Id.* at 928.

¶ 71    A fiduciary may not profit at the expense of the person who has placed trust in him. *Tummelson v. White*, 2015 IL App (4th) 150151, ¶ 19. Indeed, "any transaction in which the [fiduciary] profits is typically presumed to be fraudulent." *In re Estate of Miller*, 334 Ill. App. 3d 692, 698 (2002). When the party seeking relief establishes a fiduciary relationship, the burden shifts to the fiduciary, who must prove by clear and convincing evidence "the transaction was fair and equitable and did not result from the [fiduciary's] undue influence over the [servient party]." *Id.*

¶ 72                        C. Questions of Material Fact Precluded Summary Judgment

¶ 73    The circuit court found petitioners failed to marshal evidence from which a factfinder could determine respondents were Ellen's fiduciaries at the time she executed the 2000 trust and 2001 will. On appeal, respondents point to the evidence showing that Ellen was in good physical and mental condition at the time and that she did not require help with her activities of daily living, such as eating, cooking, bathing, toileting, and walking. They argue this evidence establishes no fiduciary relationship existed in 2000 and 2001.

15

¶ 74    To be sure, Ellen's physical and mental condition at the time she executed those documents is relevant to the issue of whether respondents were Ellen's fiduciaries. See *Hensler*, 231 Ill. App. 3d at 927 (among the factors to be considered is the disparity of age, health and mental capacity). And here, the evidence shows Ellen was "sharp" physical and mental condition and may not have required assistance with her daily life. But contrary to respondents' position, that factor is not entitled to dispositive weight—it is merely one of three factors the court was required to consider. *Id.* Viewing the evidence under all three factors, we conclude the circuit court erred when it found no genuine issue of material fact existed on whether Dennis was Ellen's fiduciary at the time she executed the 2000 trust and 2001 will.

¶ 75    The first factor is the degree of kinship between the alleged fiduciary and the alleged servient party. *Id.* Here, there is no dispute that Dennis and Terrance were Ellen's sons and lived with her for most of their lives.

¶ 76    The second factor is their disparity in age and physical and mental condition. *Id.* Dennis and Terrance were about 31 and 38 years younger than Ellen, respectively. Despite this disparity in age, however, there was no direct evidence that, in 2000 and 2001, Dennis and Terrance were in markedly better physical and mental condition than Ellen. Indeed, the record is devoid of direct evidence showing that (1) Ellen required assistance dressing, eating, cooking, bathing, toileting, or walking, (2) anyone assisted Ellen with banking and bills, and (3) Ellen relied solely on Dennis and Terrance to drive her. However, Dennis's testimony nevertheless raises the question whether Ellen needed assistance in her daily life. Dennis recalled that he basically "gave up" brokering real estate in 1994 and devoted his life to taking care of Ellen. He testified he could not both work full time and take care of Ellen. His only work after 1994 was maintaining the rental home on the Hoff

Road parcel and the grounds at Ellen's property in exchange for an expense-free living arrangement.

¶ 77    The third factor is the extent to which the allegedly servient party entrusted the handling of her business and financial affairs to and placed faith and confidence in the dominant party. *Id.* Here, the record is replete with evidence that would support a finding that Ellen placed great trust in Dennis to handle her affairs and placed confidence in his ability to do so. Beginning in 1980s, Ellen shared one of her only two bank accounts with Dennis. At some point, one of those accounts was closed, and Dennis remained a joint tenant on Ellen's only bank account.

¶ 78    Further, in 1992, Dennis became intimately involved in Ellen's business affairs, specifically with Tyler. In 1992, Ellen was at grave risk of losing a significant portion of her family farm, which provided her sole source of income. Dennis and his siblings met to discuss possible solutions and Debra and Steve offered to buy part or all of Ellen's land. Dennis, a licensed real estate broker, believed Debra and Steve's proposal significantly undervalued Ellen's property. Dennis spoke with Ellen about Debra and Steve's offer before they made it, and Ellen rejected the offer.

¶ 79    Dennis then turned to Girard, his friend since 1962, for help with the Tyler predicament. Within days of learning Girard had inherited substantial assets, Dennis brought Ellen to Girard, and they asked Girard to loan Ellen $115,000 to resolve the Tyler debt. Girard agreed to loan Ellen the money, and the money passed through Dennis's bank account to Tyler. Tyler personally thanked Dennis for paying off Ellen and Frank's debt. Dennis and Terrance later convinced Lavern to partition the Hoff Road parcel. Dennis marketed Ellen's partitioned piece of the Hoff Road parcel, and it was sold in 1999 or 2000 for $6600 per acre, which allowed Ellen to pay back Girard.

¶ 80    Around this time, Dennis, Terrance, and Ellen formed DTO. According to Dennis, Ellen had an ownership interest in the company. DTO and Girard purchased a 20-acre parcel adjacent to Ellen's farm. Dennis, Terrance, and Ellen obtained a loan from Girard to make the purchase. Dennis, Terrance, and Ellen planned to develop the parcel and run their sales through DTO.

¶ 81    Dennis also became involved in Ellen's legal matters. Specifically, in 1992 and 1995, Dennis was the primary contact between Ellen and two attorneys who had been engaged to investigate the Tyler matter. Dennis met or spoke regularly with those attorneys and provided them with documents. Portlock wrote to *Dennis* when he declined to bring suit against Tyler.

¶ 82    Dennis also pursued vindication on the Tyler matter through other avenues. In 1995, he drafted a letter, for Ellen's and Frank's signatures, to the ARDC, complaining about alleged misconduct by Tryner. As part of that effort, Dennis included with the letter his own transcript and recording of a telephone conversation between Tyler and Ellen. And in 1996, he submitted the document he believed Thomas had forged to the WCSAO. He followed up two or three times before the WCSAO told him they would not prosecute.

¶ 83    Finally, in 1998, less than two years before Ellen executed the 2000 trust, Dennis found Ridge—who later prepared the estate-planning documents at issue—in the phone book. Dennis was looking for an attorney who was also a certified public accountant to press Ellen's purported claims against Tyler, because he knew such a person would understand the accounting better than Tyler. In November 1998, Ridge sued Tyler on Ellen's behalf. When that lawsuit was dismissed in August 2000, Dennis remained involved in the matter. A section 2-1401 petition was filed to set aside the dismissal. Tyler moved to dismiss the 2-1401 petition, and Dennis signed an affidavit, attesting to the truth of the factual statements made in a response to the motion.

¶ 84        What is more, the record contains evidence showing that Dennis began to exercise control over Ellen's social life before 2001. In her deposition, Kimberly recalled that she and Debra regularly visited and spoke on the phone with Ellen. Kimberly testified that when she and Debra called Ellen, Ellen usually answered on speakerphone, which she believed was so Dennis and Terrance could surveil their conversations. Kimberly also testified that she and Debra never got "alone time" with Ellen, because Dennis would "hijack[ ]" their conversations to talk about the Tyler litigation. Kimberly also recalled instances in which Dennis and Terrance exhibited "bossy" or controlling behavior toward Ellen. For instance, Dennis would dictate when Ellen left social gatherings and controlled where they went, what they ate, and who could visit and when.

¶ 85        Thomas likewise frequently visited and spoke on the phone with Ellen before 2001. According to Thomas, Dennis began "isolating" Ellen in the late 1990s. Beginning around 1999 or 2000, Dennis was always present for Thomas's visits, did not allow Thomas and Ellen to have a private conversation, and stopped Ellen and Frank from answering questions, even though Thomas was farming Ellen's land at the time. Thomas also believed Dennis and Terrance were surveilling Ellen's phone conversations, a belief corroborated by Dennis's admission that he recorded at least two phone conversations involving Ellen.

¶ 86        Based on the foregoing evidence, a factfinder could conclude Dennis was Ellen's fiduciary at the time she executed the 2000 trust and 2001 will, because she had placed a special confidence in him that he accepted. *Hensler*, 231 Ill. App. 3d at 927-28. The record amply supports a finding that Ellen placed significant trust in Dennis to handle her personal and business affairs and that Dennis accepted that trust. That significant trust, coupled with Ellen and Dennis's degree of kinship and disparity in age and condition, would permit the factfinder to conclude a fiduciary relationship existed.

19

¶ 87        We acknowledge that our discussion focuses on Dennis and Ellen's relationship. In the circuit court, respondents noted petitioners' allegations focused primarily on Dennis and disputed whether Dennis's acts could be imputed to Terrance. However, respondents have abandoned that dispute on appeal and conceded at oral argument that Dennis's acts could be imputed to Terrance. We accept respondents' concession. See *Cheney v. Goldy*, 225 Ill. 394, 400 (1907) ("Proof of undue influence may be wholly circumstantial and inferential, and the influence may be that of a third person as well as that of direct beneficiaries; that is, if the will was the result of undue influence on the part of *** the mother of the beneficiaries, this would invalidate the will."); accord *Swenson v. Wintercorn*, 92 Ill. App. 2d 88, 102 (1968), *abrogated on other grounds In re Estate of Coffman*, 2023 IL 128867, ¶¶ 83-89. Thus, we find the lack of evidence concerning Terrance's actions of no consequence.

¶ 88        Simply put, the record presents a genuine issue as to whether Dennis was Ellen's fiduciary at the time of the disputed documents. Accordingly, we conclude the circuit court erred when it granted respondents summary judgment on counts 10 and 11. We note that our decision has not shifted the burden to respondents to establish the transactions' validity. See *Miller*, 334 Ill. App. 3d at 698. That burden shifts only after the factfinder determines a fiduciary relationship exists (*id.*), and we have merely found the factfinder *could* make that finding based on the evidence produced.

¶ 89        Before concluding, we briefly address one other point. The parties dispute whether the transactions that took place after the 2000 trust and 2001 will's execution were relevant to the issue presented in respondents' motion for summary judgment. Specifically, petitioners point to, among other things, (1) Dennis having initiated the attorney-client relationship between Ellen and McCarthy; (2) Ellen having named Dennis as her power of attorney for property in 2005,

20

(3) Ellen's 2006 sale to Dennis and Terrance, and (4) Dennis and Terrance's almost immediate resale to CenterPoint at a substantial premium. In its ruling, the circuit court found the evidence concerning those transactions—even if relevant and admissible—"inadequately relate[d] back to support the petitioners' theory that there exists a fiduciary at law or a fiduciary at fact relationship at the time" Ellen executed the documents at issue in this appeal.

¶ 90        The circuit court has "substantial discretion *** to determine the time frame within which events concerning the testator are relevant to the [issues] in a will contest suit." *In re Estate of Berry*, 170 Ill. App. 3d 454, 458 (1988). Indeed, proof of the testator's mental condition before or after she makes a will is admissible when it tends to show her mental condition at the time an instrument is executed. *Id.* (citing *Peters v. Peters*, 376 Ill. 237, 243 (1941)). However, we need not decide whether the evidence regarding the post-2001 transactions was too remote to be relevant on the fiduciary-in-fact question, because for the reasons stated above, the court erred in granting summary judgment independent of this evidence.

¶ 91                                    III. CONCLUSION

¶ 92        We reverse the judgment of the circuit court of Will County and remand the cause for further proceedings.

¶ 93        Reversed and remanded.